UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
TEAM OBSOLETE LTD., *et al.*,

                      Plaintiffs,                MEMORANDUM
                                                  AND ORDER
    -against-                                   01 CV 1574 (ILG)(RML)

A.H.R.M.A. LTD., *et al.*,

                      Defendants.
---------------------------------------------------------X

LEVY, United States Magistrate Judge:

        Plaintiffs Team Obsolete Ltd., Team Obsolete Products, Ltd., Team Obsolete Promotions Inc. and Robert T. Iannucci ("plaintiffs") move for an order disqualifying Edward M. Bendelow, Esq.[1] and the Bendelow Law Firm, P.C. (including its predecessors and successors) from acting as outside counsel for defendant A.H.R.M.A. Ltd. in this case, from communicating with counsel for defendants, and from participating in this case in any manner other than as a witness. Oral argument took place before me on May 31, 2006. For the reasons stated below, plaintiffs' motion is denied.

## BACKGROUND AND FACTS

        Plaintiffs commenced this case in March 2001 asserting claims for, *inter alia*, breach of contract, tortious interference with business relations, trademark infringement, tortious interference with contract, negligent interference with economic advantage, and violation of the California Unfair Competition statutes. (See Third Amended Complaint, dated Oct. 15, 2004 ("Compl.").) Defendant A.H.R.M.A. Ltd. d/b/a American Historic Racing Motorcycle

---

[1] Plaintiffs' submissions refer to Bendelow as "Edward T. Bendelow." (See, e.g., Notice of Motion, dated Apr. 25, 2006.) However, Bendelow uses the middle initial "M." (See Declaration of Edward M. Bendelow, Esq., dated May 5, 2006.)

Organization ("defendant" or "A.H.R.M.A.") is an Ohio not-for-profit corporation that was established in 1989 to provide a venue for racing historic motorcycles. (Id. ¶¶ 12, 13; Declaration of Edward M. Bendelow, Esq., dated May 5, 2006 ("Bendelow Decl."), Ex. G.) Plaintiff Robert T. Iannucci claims to be "the creator and primary promoter of the sport of racing historic motorcycles in the USA." (Affidavit of Robert T. Iannucci, sworn to Apr. 25, 2006 ("Iannucci Aff."), ¶ 6.) He collects and races rare, vintage motorcycles and is the principal shareholder of Team Cuisine d/b/a Team Obsolete Racing ("Team Cuisine"), a New York "Sub S" corporation. (Compl. ¶¶ 5, 14; Reply Affidavit of Robert T. Iannucci, sworn to May 19, 2006 ("Iannucci Reply Aff."), ¶ 5.)

In the late 1970's or early 1980's, Team Cuisine, with the assistance of an "associate and financial sponsor,"[2] formed A.H.R.M.A. as a privately held business corporation, with the purpose of popularizing historic motorcycle racing. (Iannucci Aff. ¶¶ 10, 13.) Iannucci held no official position or title with A.H.R.M.A. (Iannucci Reply Aff. ¶ 9.) In 1989, A.H.R.M.A. was reorganized into a member-owned not-for-profit association governed by a 12-member Board of Trustees, which is elected from among the membership. See http://www.ahrma.org/rulebook/sec16.htm. (last visited July 7, 2006). A.H.R.M.A. has a national office in Tennessee, which coordinates various national-championship events and series. (Id.)

To establish A.H.R.M.A. as a not-for-profit association, Iannucci claims to have hired attorney Edward M. Bendelow, who allegedly gave Iannucci legal advice, including recommending creating the position of "Special Advisor" for Iannucci. (Iannucci Aff. ¶¶ 18, 20,

---

[2] This is apparently a reference to Jeffrey Elghanayan, Iannucci's business partner in Team Cuisine, who sued Iannucci in 1988 in an effort to bar him from transferring vintage motorcycles and related equipment. (Bendelow Decl. ¶ 24, Ex. M.)

25.) Iannucci states that he believed this position would entitle him to sit on and participate in all meetings of the Board of Trustees, including executive sessions. (Id. ¶ 25.) He understood that this position would not give him a vote, but claims the position was intended to allow him to participate in discussions of all issues and be informed of board actions. (Id.)

Upon the formation of A.H.R.M.A., Iannucci was made Special Advisor to the Board. (Id. ¶ 26.) He claims that he was later "forced out" of this position by Bendelow and Jeffrey Smith, who became Executive Director of A.H.R.M.A. in 1991. (Id.)

Iannucci maintains that, because of his bad experience with the associate-sponsor – who allegedly claimed to be the sole owner of Team Obsolete and "made a very strong play" to take away all of Iannucci's prized motorcycles – he was very concerned about preserving his interests and ability to participate in motorcycle racing. (Id. ¶¶ 19, 21.) He claims that he stressed this concern in his private discussions with Bendelow, who allegedly assured Iannucci that his interests would be protected. According to Iannucci, Bendelow said, "You are the number 1 creator. No one is going to lock you out" and "You are the benefactor." (Id. ¶ 23.) Iannucci and Bendelow also allegedly discussed making Iannucci a permanent voting member of the Board of Trustees, something Bendelow supposedly advised against. (Id. ¶¶ 24, 25.)

Iannucci also alleges that, during their conversations about the formation of A.H.R.M.A. and other business matters, he revealed "detailed confidential financial information" to Bendelow, including information about how he earned money and how he financed Team Obsolete. (Id. ¶¶ 23, 24, 27.) Iannucci states that his relationship with Bendelow "was a close and confidential one, based upon the belief and understanding that he was my lawyer, and as such I was entitled to having my confidences respected." (Id. ¶ 29.) He further maintains that he

-3-

continued to have a "close and confidential" relationship with Bendelow until Smith took over A.H.R.M.A. in 1991 and began a "campaign" to drive Iannucci out. He claims that, after 1992, Bendelow "became a more active partisan" against him and ultimately became A.H.R.M.A.'s "strategist and architect of the long series of conflicts targeted" at him. (Id. ¶ 34.) Eventually, Bendelow allegedly drafted the "Team Owner Assessment Rule,"[3] which, according to Iannucci, was specifically designed to exclude Iannucci and Team Obsolete from participating in A.H.R.M.A.'s racing events. (Id. ¶ 35.)[4]

In this case, A.H.R.M.A. is represented by the law firm of Westerman Ball Ederer & Sharfstein, LLP. Bendelow, who is not affiliated with that firm, serves as "co-counsel" or "associate counsel" in his capacity as outside general counsel for A.H.R.M.A. He is not, however, counsel of record in this matter. Nor has he appeared before the court in this action. (Bendelow Decl. ¶ 3.) According to plaintiffs, Bendelow "has played an active role in the litigation and is apparently directing defendant's counsel of record." (Memorandum of Law in Support of Motion to Disqualify Edward [M.] Bendelow and the Bendelow Law Firm, P.C., dated Apr. 25, 2006 ("Pl.'s Mem."), at 11.) Indeed, Iannucci claims that Bendelow is "orchestrating this litigation, just as he orchestrated the multiple controversies that preceded it." (Iannucci Aff. ¶ 37.)

In response, Bendelow argues that Iannucci's "purpose in this litigation is to bleed A.H.R.M.A.'s resources by delaying resolution of this case and forcing A.H.R.M.A. to expend

---

[3] Bendelow denies that he drafted this rule. (Bendelow Decl. ¶ 32.)

[4] Iannucci asserts that this rule "made it possible for AHRMA to terminate the membership of a 'team owner' (a new category) without a hearing for an alleged transgression of its rider even if the team owner was unaware of the alleged transgression[.]" (Iannucci Reply Aff. ¶ 12.)

resources responding to his improper and abusive litigation tactics." (Bendelow Decl. ¶ 2.) Bendelow insists that he was never Iannucci's attorney. Rather, he states that he was retained to represent A.H.R.M.A, and that Iannucci was "actually represented by separate counsel at the time this for-profit entity sold assets to A.H.R.M.A. in 1989." (Id. ¶ 4.) Bendelow also claims that he "made clear to Iannucci in writing" that his firm represented A.H.R.M.A. and not Iannucci. (Id.) He states unequivocally: "I have never represented Iannucci, personally or in any of his business activities." (Id. ¶ 9.)

Bendelow further argues that, even if the court were to find that his firm represented Iannucci, the matters that were at issue in 1989 during the formation of the "new" A.H.R.M.A. "bear no relationship to the claims in this lawsuit." (Id. ¶ 5.) He also points out that his firm was counsel of record for A.H.R.M.A. in two other lawsuits against Team Obsolete (one involving the SUPERMONO trademark claims, also at issue in this case), and that Team Obsolete never moved to disqualify him in those cases. (Id. ¶ 6.) He emphasizes that plaintiffs did not complain of a conflict until five years after the inception of this case, and argues that the instant motion is simply a delay tactic designed to "drive up the costs for A.H.R.M.A." (Id. ¶ 7.)

## DISCUSSION

Disqualifying a party's counsel is a "drastic measure" that requires the balancing of two important considerations. A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 160 F. Supp. 2d 657, 662-63 (S.D.N.Y. 2001). On one side is the deference the system gives a party in selecting counsel of its choice, and on the other side is the need for the profession to maintain the highest degree of fiduciary and professional standards. Hempstead Video, Inc. v. Incorporated Vill. of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005); Evans v. Artek Sys. Corp., 715 F.2d 788, 791

(2d Cir. 1983). Disqualification of an attorney imposes a substantial transaction cost on a party. The affected party usually incurs the costs associated with finding a new attorney who must then become familiar with the matter. Government of India v. Cook Indus., Inc., 569 F.2d 737, 739 (2d Cir. 1978); Siemens Energy & Automation, Inc. v. Coleman Elec. Supply Co., Inc., No. 98 Civ. 3416, 1999 WL 551223, at *4 (E.D.N.Y. June 23, 1999). In addition, the party loses the benefit of a chosen counsel's expertise in a field and specialized knowledge of the party's affairs. Government of India, 569 F.2d at 739.

In preserving professional standards, the court is not strictly interested in policing the ethics rules. Universal City Studios v. Reimerdes, 98 F. Supp. 2d 449, 455 (S.D.N.Y. 2000); see also Hempstead Video, Inc., 409 F.3d at 132 ("[N]ot every violation of a disciplinary rule will necessarily lead to disqualification."); Board of Educ. of the City of New York v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979) ("[W]e have shown considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct."). That is a job better left to specialized professional disciplinary bodies, including the Grievance Committee of this Court. Nyquist, 590 F.2d at 1246; Reilly v. Computer Associates Long-Term Disability Plan, 423 F. Supp. 2d 5, 9 (E.D.N.Y. 2006); Etna Prods. Co. v. Tactica Int'l, 234 F. Supp. 2d 442, 445 (S.D.N.Y. 2002). Rather, "[t]he objective of the disqualification rule is to 'preserve the integrity of the adversary process.'" Evans, 715 F.2d at 791 (quoting Nyquist, 590 F.2d at 1246). As a result, disqualification is only appropriate where allowing the representation to continue would pose "a significant risk of trial taint." Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981). See also Frontline Communications Int'l v. SprintFrontline Communications Int'l, 232 F. Supp. 2d 281, 288 (S.D.N.Y. 2002) ("The Second Circuit has clearly and repeatedly held that a violation

of the Code of Professional Responsibility should result in disqualification only when the violation taints the integrity of the proceeding before the court.")

Disqualification motions are left to the discretion of the district court. <u>Hull v. Celanese Corp.</u>, 513 F.2d 568, 571 (2d Cir. 1975); <u>Human Elecs. v. Emerson Radio Corp.</u>, 375 F. Supp. 2d 102, 105 (S.D.N.Y. 2004). A court should disqualify an attorney for a conflict of interest only where the conflict raises a significant risk that the attorney will be unable to represent his or her client with zeal and vigor or where the attorney possesses privileged information, obtained through prior representation of an adverse party, that might benefit his or her current client. <u>Glueck</u>, 653 F.2d at 748; <u>Commercial Union Ins. Co. v. Marco Int'l Corp.</u>, 75 F. Supp. 2d 108, 110 (S.D.N.Y. 1999). In short, an attorney may be disqualified from representing a client in a particular case if:

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues of the present law suit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

<u>United States v. DiTommaso</u>, 817 F.2d 201, 219 (2d Cir. 1987) (citing <u>Evans</u>, 715 F.2d at 791).

The Second Circuit disfavors disqualification and therefore requires the party seeking disqualification to satisfy a "high standard of proof" in order to succeed. <u>Evans</u>, 715 F.2d at 791 (quoting <u>Government of India</u>, 569 F.2d at 739). "Mere speculation will not suffice." <u>Paretti v. Cavalier Label Co.</u>, 722 F. Supp. 985, 987 (S.D.N.Y. 1989). This is especially

important because motions to disqualify are "often interposed for tactical reasons," and in the best of situations "inevitably cause delay." Nyquist, 590 F.2d at 1246.[5]

Therefore, the key questions are whether (1) Bendelow or his firm acted as counsel for Iannucci in 1988 or 1989 in connection with the establishment of the "new" A.H.R.M.A.; (2) Bendelow had access to privileged information during that representation; and (3) Bendelow is in a position to use that privileged information in order to give his present client, A.H.R.M.A, an unfair advantage in this litigation. Nyquist, 590 F.2d at 1246.

As an initial matter, Iannucci does not deny that he had no formal attorney-client agreement with Bendelow. Nor does he allege that he personally paid Bendelow for his services. He instead relies on cases holding that an attorney may owe a fiduciary duty to a person "with whom he deals" when he has or should have reason to believe that the person would rely on him. See Cohen v. Goodfriend, 665 F. Supp. 152, 158 (E.D.N.Y. 1987); Heine v. Colton, Hartnick, Yamin & Sheresky, 789 F. Supp. 360, 368 (S.D.N.Y. 1992).

For example, in Croce v. Kurnit, 565 F. Supp. 884 (S.D.N.Y. 1982), aff'd, 737 F.2d 229 (2d Cir. 1984), the plaintiff (singer and songwriter Jim Croce's surviving spouse) brought a claim for breach of fiduciary duty against an attorney for failing to advise Jim Croce to obtain outside counsel with respect to certain recording, publishing, and managerial contracts. The attorney was an officer in the subject publishing and managerial companies. The court explained that:

---

[5] On the other hand, the Second Circuit has cautioned that "any doubt is to be resolved in favor of disqualification." Hull, 513 F.2d at 571; see also LaSalle Nat'l Bank v. County of Lake, 703 F.2d 252, 257 (7th Cir. 1983) ("any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification").

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

Id. at 891 (citing Penato v. George, 383 N.Y.S.2d 900 (2d Dep't 1976)). The court held that the attorney's introduction as "the lawyer," his explanation to the Croces of the "legal ramifications" of the contracts, which contained a number of legal terms and concepts, his interest as a principal in the transactions, his failure to advise the Croces to obtain outside counsel, and the Croces' lack of independent representation "taken together establish[ed] both a fiduciary duty on the part of [the attorney] and a breach of that duty." Id. at 890. In other words, the lawyer breached a fiduciary duty by not advising the Croces to retain independent counsel and by proceeding to explain the legal significance of contracts to which the attorney was also a party. Id.

The question here, then, is whether Bendelow reasonably had or should have had reason to believe that Iannucci was relying on him for legal advice. Iannucci maintains that, in the four months before Bendelow was retained by the "new" not-for-profit A.H.R.M.A. on January 14, 1989, Iannucci and Bendelow "spent many hours on the telephone and in person deciding a new direction for 'old' AHRMA, and crafting a transition." (Iannucci Reply Aff. ¶ 8.) He claims that, during those conversations, he "disclosed confidential information, and laid out [his] long term plans for [his] racing team, and its financial structure." (Id.) He states that he also discussed obtaining sponsors for his team, buying and selling motorcycles and renting motorcycles to racers, and that he "explained to [Bendelow] how [these] items fit in to the financial structure of Team Obsolete." (Id.)

Prior to January 14, 1989, all correspondence from Bendelow to A.H.R.M.A. was sent to Iannucci at his Brooklyn address, including a retainer agreement with A.H.R.M.A. (which only Bendelow signed)[6] and monthly invoices, which reflect numerous telephone calls with Iannucci. (See id. Exs. 8, 9.) Iannucci argues that this was because he was "the real party of interest" and "clearly the beneficial owner" of A.H.R.M.A., even though he had no official position or title with "old" A.H.R.M.A. (Id. ¶ 9.) Bendelow points out, however, that he also dealt with other representatives of the organization, including Matt Benson (the Executive Director), Mike Smith (the treasurer), and Sherry Winn (the business manager). (Bendelow Decl. ¶ 13.)

Iannucci also denies that he had separate counsel in the 1989 transaction. Rather, he states that he retained an attorney named Neal Goldman to provide a legal opinion as to whether Iannucci, as a 50 percent partner of Team Cuisine, was authorized to sell "old" A.H.R.M.A. assets, which were owned by Team Cuisine. (Iannucci Reply Aff. ¶ 11.) According to Iannucci, the partnership dispute with the other shareholder of Team Cuisine is a separate matter, unrelated to the establishment of the "new" A.H.R.M.A. (Id.)

Bendelow denies that he had a fiduciary relationship with Iannucci. He points out that the retainer agreement is with A.H.R.M.A., not Iannucci, and he identifies two letters – one dated September 1991 and one dated July 1999 – in which Bendelow stressed that his responsibilities were to the corporation. (See Bendelow Decl., Exs. O and P.) He also emphasizes that the Bill of Sale, pursuant to which "old" A.H.R.M.A. sold its assets and liabilities to the new

---

[6] A.H.R.M.A.'s Executive Director, Jeff Smith, ultimately signed a retainer agreement with Bendelow on January 28, 1991. (See Bendelow Decl., Ex. F.)

association, was signed only by Sherry Winn on behalf of A.H.R.M.A. (See id., Ex. J.) On the other hand, Bendelow does not deny that he and Iannucci had numerous conversations about the establishment of the "new" A.H.R.M.A. prior to that entity's formal existence. Given Iannucci's and Bendelow's starkly different characterizations of the events leading to the formation of the "new" A.H.R.M.A., there may be factual issues as to whether Bendelow gave Iannucci legal advice under circumstances in which he knew or should have known Iannucci would rely on it.[7]

Iannucci's argument is weak, however, with respect to the issue of relatedness. Unlike the plaintiff in Croce, Iannucci is not suing for breach of fiduciary duty. Obviously, in a breach of fiduciary duty case, the prior representation is directly and inextricably tied to the pending matter. Instead, Iannucci is asserting such a breach as a basis for disqualification in a different matter. It is therefore Iannucci's burden to demonstrate that there is not just a connection, but a "substantial relationship," between the prior representation and the issues in the current lawsuit.

In determining whether two matters are "substantially related," courts look to whether "'the relationship between issues involved in the prior and present cases is "patently clear."'" Pastor v. TWA, 951 F. Supp. 27, 31 (E.D.N.Y. 1996) (quoting Government of India, 569 F.2d at 739-40). Generally, this element is satisfied "if central issues are common to both [matters] and if 'the witnesses, testimony, and other evidence germane to one action are likely to be similar to the other.'" Id. (quoting Red Ball Interior Demolition Corp. v. Palmadessa, 908 F.

---

[7] Iannucci states that he is an attorney who has practiced law in New York and New Jersey and has himself represented clients. (Iannucci Aff. ¶ 3.) Iannucci's knowledge and level of sophistication as a lawyer would, of course, factor into any analysis of whether and to what extent he relied on Bendelow's legal advice.

Supp. 1226, 1244 (S.D.N.Y. 1995)).

Plaintiffs argue that there is a substantial relationship between the 1989 transaction, in which the "new" not-for-profit A.H.R.M.A. was created, and the current case because "[i]t is the structure of the new A.H.R.M.A. which was used to foster the anticompetitive behavior which is at the heart of this litigation." (Pl.'s Mem. at 8.) Iannucci argues that it was Bendelow who proposed the creation of a new not-for-profit member-owned association and the "at large" voting scheme, which he claims "effectively placed the new A.H.R.M.A. under [Bendelow's] control," and that Bendelow has used confidential information Iannucci provided during that time "as ammunition" to drive Iannucci from the sport and orchestrate the present conflict. (Iannucci Aff. ¶¶ 18, 24; Pl.'s Mem. at 8.)

In connection with the establishment of the "new" A.H.R.M.A., Bendelow claims that his firm performed the following services: (1) incorporating A.H.R.M.A. as a not-for-profit corporation in Ohio; and (2) obtaining tax exempt status for A.H.R.M.A.[8] (Bendelow Decl. ¶¶ 17, 18.) The retainer agreement also indicates that Bendelow was to advise the organization "regarding [the] formation of a sanctioning body." (Id., Ex. B.) Plaintiffs' claims in the instant case include: (1) Iannucci's claim that A.H.R.M.A. breached his membership contract by refusing to renew and/or by revoking his A.H.R.M.A. membership in January 1999; (2) Team Obsolete's claim that A.H.R.M.A. tortiously interfered with its relationship with certain sponsors in the late 1990's; (3) Team Obsolete's claim that A.H.R.M.A. tortiously interfered with its relationship with the "Sound of Thunder" promoters in 1997 or 1998; and (4) claims alleging infringement of the

---

[8] This work was actually done by Bendelow's former law partner, John Dethman. (Bendelow Decl. ¶ 14 n.1.)

"SUPERMONO" trademark in 1996 and 1997. (See Third Amended Compl.)[9] In short, all of the events underlying the Complaint took place more than six years after the creation of the "new" A.H.R.M.A. Contrary to plaintiffs' argument, whether or not the "structure" of the association "fostered" the alleged anticompetitive conduct[10] in some way, that structure is not central to this case. Rather, it is the alleged conduct itself that is at issue. While A.H.R.M.A.'s corporate structure might have some relevance, plaintiffs have not demonstrated an identity of issues between the 1989 transaction and the current lawsuit.

As to whether Bendelow had access to privileged information in the period leading to the formation of the "new" A.H.R.M.A., "[i]t is well established that a court may not inquire into the nature of the confidences alleged to have been revealed to the [allegedly] tainted attorney [because] [t]o require proof of access to privileged information would 'put the former client to the Hobson's choice of either having to disclose his privileged information in order to disqualify his former attorney or having to refrain from the disqualification motion altogether.'" Cheng v. GAF Corp., 631 F.2d 1052, 1056 (2d Cir. 1980) (quoting Government of India, 569 F.2d at 740), vacated on other grounds, 450 U.S. 903 (1981). Therefore, when a court has already found that there was an attorney-client relationship and the issues in the pending case are substantially related to the subject of the earlier representation, there is a presumption that the attorney "was likely to have had access to relevant privileged information." Id. at 1056.

---

[9] Plaintiffs' other claims have either been dismissed or concern only the individual riders, not Iannucci. (See Defendant A.H.R.M.A.'s Memorandum of Law in Opposition to Plaintiff's Motion to Disqualify, dated May 5, 2006, at 10-11.)

[10] As defendants point out, Judge Glasser dismissed plaintiffs' antitrust claims by order dated March 24, 2005.

That does not mean that nothing should ever be required of a former client when an attorney has positively stated that he has never received any confidential communications from the former client. The presumption of access is rebuttable, and an attorney can rebut the presumption by stating explicitly that no confidences were ever received from the former client. See Cromley v. Board of Educ. of Lockport Twp. High Sch. Dist., 17 F.3d 1059, 1065 (7th Cir. 1994) ("Uncontroverted affidavits are sufficient rebuttal evidence"); see also Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 757 (2d Cir. 1975) (noting that attorney "denied having been entrusted with any such confidences" and that "[h]e was supported in this respect by the affidavits of [two other attorneys with whom he had worked]." This was sufficient to rebut the inference that he possessed confidences that could be used against his former client).

Here, Bendelow expressly denies ever having received "confidences or secrets from Mr. Iannucci or Team Obsolete of any kind." (Bendelow Decl. ¶ 47.) He also contends that, to the extent he received any information from Iannucci, that information is irrelevant to this case. Plaintiffs, for their part, maintain that Bendelow obtained information from Iannucci that would necessarily include insights as to "what to ask for in discovery, whom to depose, what questions to ask, what lines of attack to pursue and which to abandon and other matters." (Pl.'s Mem. at 9.) However, these are conclusory statements. Plaintiffs do not elaborate on how the information Iannucci disclosed during that time could be used to plaintiffs' disadvantage in this case. Put another way, even if sensitive, confidential information was discussed during the course of incorporating the "new" A.H.R.M.A., there is no indication that any such information would be relevant to the dispute at bar. Plaintiffs have not articulated how that transaction has anything to do with whether or not A.H.R.M.A. breached Iannucci's membership contract, tortiously

interfered with Team Obsolete's relationships with sponsors or promoters, or infringed a trademark. See Siemens Energy & Automation, Inc., 1999 WL 551223, at *7 (denying disqualification motion where movant's assertions of a substantial relationship between prior representation and pending litigation were conclusory).

Moreover, although Iannucci claims to have disclosed confidential business information to Bendelow during their conversations, he has not shown that it was necessary for him to do so in order to receive legal advice. It is well-established that making statements to an attorney, in and of itself, does not render the communication or the advice privileged. See Logosch v. Congel, No. Civ. 1:00-CV-0784, 2006 WL 931687, at *13 (N.D.N.Y. Mar. 7, 2006). Rather, "the communication must be with an attorney for the express purpose of securing legal advice." Fisher v. United States, 425 U.S. 391, 403 (1976). Business and personal advice are not covered by the privilege. See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984). See also Elghanayan v. Iannucci, 535 N.Y.S.2d 611, 612 (1st Dep't 1988) (annexed as Ex. M to the Bendelow Decl.) (explaining that "social conversations" do not create an attorney-client relationship). Iannucci may have chosen to share private business or personal information with Bendelow in the context of their relationship, which was apparently friendly at the time, but he has not met his burden of demonstrating that all of the communications were for the purpose of procuring legal advice.[11] Thus, even assuming that Bendelow and Iannucci had an attorney-client relationship, Iannucci has not shown that the information he disclosed constitutes privileged matter.

---

[11] Indeed, Iannucci describes his conversations with Bendelow as "wide ranging discussions on business and the law," and states that he and Bendelow "discussed a number of ventures." (Iannucci Aff. ¶ 27.)

Finally, it bears noting that A.H.R.M.A.'s attorneys have invested significant time, energy and resources in this case since it began more than five years ago. This action has had a tortured history, and discovery is currently scheduled to be completed by August 15, 2006. There is little doubt that defendants would suffer some prejudice were Bendelow to be disqualified at this point. Tylena v. Heartshare Human Servs., No. 02 Civ. 8401, 2004 WL 1252945, at *3 (S.D.N.Y. June 7, 2004) (denying disqualification motion and noting that where counsel had been engaged for over one year in preparation of lawsuit, "[d]isqualification of present counsel and the substitution of a new attorney unfamiliar with the facts and the law will inevitably result in further harmful delay and expense" to plaintiff). It is true that defendants' primary counsel, Westerman Ball Ederer & Sharfstein LLP, would continue its representation and A.H.R.M.A. would not be forced to start over with new counsel. Nonetheless, Bendelow's exclusion would create a hardship for defendants.

In sum, having closely reviewed the parties' submissions, I find that plaintiffs have not met their burden of proving that Bendelow's disqualification is necessary in order to avoid trial taint. Defendant's motion for Rule 11 sanctions will be addressed separately.

SO ORDERED.

/s/
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
July 18, 2006